STEPHANIE YONEKURA
Acting United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
TERRENCE P. MANN (Cal. Bar No. 211377)
SHEILA NAGARAJ (Cal. Bar No. 268927)
Assistant United States Attorneys
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (714) 338-3536/(213) 894-2690
     Facsimile: (714) 338-3708/(213) 894-3713
     E-mail: terrence.mann@usdoj.gov
             sheila.nagaraj@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No. 13-537-BRO-14 |
| Plaintiff, | GOVERNMENT'S OPPOSITION TO MOTION TO SUPPRESS EVIDENCE FILED BY DEFENDANT TANNOUS FAZAH |
| v. | |
| LEONEL LAREDO, et al., #14) Tannous Fazah, | Hearing Date: March 26, 2015<br>Hearing Time: 9:30 a.m.<br>Location:    Courtroom of the Hon. Beverly Reid O'Connell |
| Defendants. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Terrence P. Mann and Sheila Nagaraj, hereby files its opposition to the motion to suppress evidence filed by defendant TANNOUS FAZAH. (Docket No. 494; the "Motion.")

This opposition is based upon the attached memorandum of points and authorities, the attached declaration of Assistant United States

Attorney Terrence P. Mann and exhibits, the files and records in this case, and any other evidence or argument that the Court may wish to consider at any future proceeding in this matter.  In the absence of any factual dispute between the parties, no declarations of law enforcement officers have been included herewith; and the Court may, thus, rule on the Motion without an evidentiary hearing.  The government respectfully requests the opportunity to supplement this opposition – including with one or more declarations, if the Court wishes such further evidentiary presentation – in the future.

Dated: February 26, 2015           Respectfully submitted,

STEPHANIE YONEKURA
Acting United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

　　　　/S/
_____
TERRENCE P. MANN
SHEILA NAGARAJ
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                              PAGE


TABLE OF AUTHORITIES..................................................iii

MEMORANDUM OF POINTS AND AUTHORITIES....................................1

I.   INTRODUCTION.......................................................1

II.  STATEMENT OF FACTS.................................................1

     A.   911 Callers Report a Shooting and Subsequent
          Investigation by Police Leading up to the Search of
          the Subject Premises..........................................1

     B.   Warrantless Entry into the Subject Premises in Pursuit
          of Suspects Believed to Have Fled a Murder Scene, as
          well as after Observing Nonresponsive, Possibly
          Injured Individuals...........................................4

III. ARGUMENT...........................................................5

     A.   The Initial Warrantless Search of the Subject Premises
          Was Justified by Probable Cause Coupled with Exigent
          Circumstances or, Alternatively, by the "Hot Pursuit"
          Exception to the Warrant Requirement..........................6

          1.   The warrantless search was justified by officers'
               objectively reasonable concern for the immediate
               safety of others.........................................7

          2.   Alternatively, the initial warrantless entry was
               justified by "hot pursuit" exigent circumstances........10

IV.  CONCLUSION........................................................12

**TABLE OF AUTHORITIES**

DESCRIPTION                                                              PAGE

**FEDERAL CASES**

Brigham City, Utah v. Stuart,
    547 U.S. 398 (2006)..........................................7

Illinois v. Gates,
    462 U.S. 213 (1983)..........................................6

United States v. Alaimalo,
    313 F.3d 1188 (9th Cir. 2002)................................6

United States v. Black,
    482 F.3d 1035 (9th Cir. 2006).............................8, 9

United States v. Echegoyen,
    799 F.2d 1271 (9th Cir. 1986)................................7

United States v. Good,
    780 F.2d 773 (9th Cir. 1986).................................7

United States v. Johnson,
    256 F.3d 895 (9th Cir. 2001)................................11

United States v. Licata,
    761 F.2d 537 (9th Cir. 1985).................................7

United States v. McCabe,
    582 Fed. Appx. 680 (9th Cir. July 2, 2014)..................10

United States v. McClendon,
    714 F.3d 1211 (9th Cir. 2013)................................5

United States v. McConney,
    728 F.2d 1195 (9th Cir. 1984)................................6

United States v. Reyes-Bosque,
    596 F.3d 1017 (9th Cir. 2010)................................9

United States v. Santana,
    427 U.S. 38 (1976).......................................11, 12

United States v. Scott,
    705 F.3d 410 (9th Cir. 2012).................................6

United States v. Snipe,
    515 F.3d 947 (9th Cir. 2008).................................7

Welsh v. Wisconsin,
    466 U.S. 740 (1984)......................................10, 11

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Defendant TANNOUS FAZAH ("defendant") has moved to suppress evidence seized during the execution of a court-authorized search warrant on March 14, 2010 at a residential apartment unit[1] on Stafford Avenue in Huntington Park, California (hereinafter, the "Subject Premises").[2]  (Docket No. 494; the "Motion.")  Defendant argues that he had a reasonable expectation of privacy at the Subject Premises and that it was violated when officers entered his apartment while attempting to locate murder suspects, who witnesses reported having observed fleeing into defendant's apartment building.[3]  As explained below, the initial warrantless entry was permissible because it was based on probable cause, as well as multiple exceptions to the warrant requirement – in particular, exigent circumstances.  The Motion therefore should be denied.

**II.  STATEMENT OF FACTS**

**A.   911 Callers Report a Shooting and Subsequent Investigation by Police Leading up to the Search of the Subject Premises**

On March 14, 2010, at approximately 1:00 a.m., the Huntington Park Police Department ("HPPD") responded to the west alley of

---

[1] A specific description of the Subject Premises is included in Exhibit B attached hereto, with the exact address redacted for safety reasons.  Unredacted versions of all exhibits can be made available at the Court's request.

[2] Although it is not expressly asserted in defendant's Motion, he appears to argue that the initial warrantless entry into the apartment tainted the subsequent court-authorized search, which relied principally on the facts gleaned from the officers who conducted that initial search.

[3] Given the property owner's statement that defendant lived at the Subject Premises, his presence there at the time of the search, and his statement that it was his apartment, defendant appears to possess the requisite standing to raise this claim.

1

Templeton Street, in response to 911 callers who reported hearing a single gunshot in the vicinity and a male victim bleeding from the head lying nearby. (Exhibit A, March 14, 2010 HPPD Arrest Report, at 3-4.)[4]

Officers then began canvassing the area for witnesses, while HPPD Detective ("Det.") Prado spoke with one of the 911 callers in an effort to obtain more information about the crime. (Id. at 3.) The 911 caller ("Caller #1") refused to give his/her location because of fear of retaliation by the suspects, but told Detective Prado that while watching television, the witness heard a single gunshot and immediately observed, through a window, several "cholos" running west of Randolph Street toward Stafford Avenue. (Id.) Caller #1 reported that the suspects then entered the apartment complex that included the Subject Premises, though the witness was unsure as to whether the suspects entered the parking lot area or a west-facing door leading into a stairwell. (Id.) While Det. Prado was speaking with Caller #1, the witness told Det. Prado that some of the suspects he/she observed running west in the alley had arrived in a small white vehicle, facing north. (Id.) Det. Prado noticed a white Mitsubishi Mirage parked in the location described by Caller #1 and walked over to it. (Id.) Caller #1 then told Det. Prado that he/she could see the detective and that he was standing next to the vehicle Caller #1 was describing. (Id.)

Det. Prado then contacted a second 911 caller ("Caller #2") to obtain further information from him. Caller #2 related that he/she

---

[4] "Exhibit" refers to the exhibits attached to this Opposition and is followed by the particular Exhibit letter ("A," "B," etc.) and corresponding page number(s). All of the attached exhibits have been numbered starting at 001 for the Court's ease of reference.

2

1  was watching television in his/her living room at approximately 12:30
2  a.m. and heard people across the street.  (Exhibit A at 4.)  Caller
3  #2 looked outside of a window and observed six to eight people
4  standing next to a white Mitsubishi.  (Id.)  A few minutes later,
5  Caller #2 heard a single gunshot east of his/her location and, upon
6  looking out of the window again, saw 10-15 people running west on
7  Randolph Street, toward Stafford Avenue, and ultimately into the
8  parking lot of the Subject Premises.  (Id.)  Caller #2 described one
9  of the subjects who passed by as a male Hispanic in his 20s, wearing
10 a black shirt.  (Id.)  Caller #2 described all of the subjects as
11 "gang members."  (Id.)
12      At this point, Det. Prado knocked on the door of a residence on
13 Randolph Street (i.e., a home immediately south of the Subject
14 Premises) and informed the woman who answered the door that Det.
15 Prado believed a suspect or suspects may have entered any of the
16 three properties immediately north of her home.  (Id.)  The woman
17 told Det. Prado that: she owned the building containing the Subject
18 Premises and two additional apartment units (referred to here as
19 "Stafford Avenue Residence #1" and "Stafford Avenue Residence #2"),
20 the latter of which was attached to the Subject Premises; her son
21 lived at Stafford Avenue Residence #1; and her daughter and grandson
22 (later identified as defendant) resided at the Subject Premises.
23 (Id.)  The woman provided Det. Prado with the keys to enter each of
24 the three locations.  (Id.)
25      Through a patrol unit's loudspeaker system, Det. Prado then
26 asked, in English and Spanish, the residents of each of the three
27 addresses to step out of their homes and make contact with officers.
28 (Id. at 5.)  Several individuals came out and told officers that

3

1 everything was fine.  (Exhibit A at 5.)  HPPD Sergeant Chacon asked
2 those individuals for consent to search Stafford Avenue Residence #2
3 (i.e., the unit attached to the Subject Premises), which consent was
4 provided, and the search was completed without incident.  (Id.)
5 Similarly, the residents of Stafford Avenue Residence #1 came to the
6 front door and, after Det. Prado explained the situation, gave
7 consent to search, which was also completed without incident.  (Id.)

        **B.    Warrantless Entry into the Subject Premises in Pursuit of Suspects Believed to Have Fled a Murder Scene, as well as after Observing Nonresponsive, Possibly Injured Individuals**

10     Det. Prado made several more loudspeaker announcements, again
11 asking the residents of the Subject Premises to come outside.  (Id.)
12 After receiving no response, Det. Prado attempted to unlock the door
13 with the key provided to him by the owner.  At this point, defendant
14 emerged from the front door and asked what was going on.  (Id.)  Det.
15 Prado asked defendant if he was all right, and defendant stated that
16 he was fine.  (Id.)  While Det. Prado and defendant were speaking,
17 the detective observed two individuals in a bedroom in the apartment,
18 with one subject lying on a bed and the other on the ground.  (Id.)
19 Several other individuals began walking out of the residence, but the
20 two supine subjects did not respond to officers' repeated requests to
21 come out.  Because of concerns for the safety of the individuals, at
22 that point officers entered the Subject Premises.  (Id.)  Ultimately,
23 the subject on the bed complied with officers' demands to stand up,
24 but the second subject, who was lying on the ground, opened his eyes
25 and moved, but continued to keep his hands hidden until Det. Valle,
26 on Det. Prado's orders, used a taser on the subject.  (Id. at 6.)
27 Det. Prado then observed that the tased subject had what appeared to
28 be dried blood on both of his hands.  (Id.)

4

While in the bedroom, Det. Prado observed a large capacity 9mm magazine laying in an open dresser drawer. (Exhibit A at 6.) While doing a protective sweep of the bedroom, officers also observed a large rifle standing against the wall of the closet. The officers did not search any other portion of the apartment. After conducting a field lineup of each of the detained subjects, in which none of them was positively identified by witnesses, defendant and four other subjects from the Subject Premises were placed under arrest and transported to the station for booking. (Id. at 6-7.) No evidence was seized from the apartment at that time.

Later that same day, the Honorable Mike Camacho, Magistrate Judge of the Superior Court of California, County of Los Angeles, authorized a search of the Subject Premises and two vehicles, based on a sworn affidavit of HPPD Det. Alpizar. (See Exhibit B, Search Warrant, at 10-18.) The ensuing search yielded, among other things, two bags of methamphetamine, a small amount of marijuana, a digital scale, "pay and owe" sheets, ammunition of different calibers, and a rifle. (Exhibit C, Return to Search Warrant, at 21-22.)

**III. ARGUMENT**

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Const. Amend. IV. "Searches and seizures that offend the Fourth Amendment are unlawful and evidence obtained as a direct or indirect result of such invasions is considered 'fruit of the poisonous tree' and is inadmissible under the exclusionary rule." United States v. McClendon, 714 F.3d 1211, 1215 (9th Cir. 2013) (internal citation omitted). Searches of a person's home are presumably unreasonable without a warrant, and the burden of proving that a warrantless search or seizure falls within

5

an exception to this requirement is on the government.  See <u>United States v. Scott</u>, 705 F.3d 410, 416 (9th Cir. 2012).  In light of the exceptions to the warrant requirement discussed below, the government submits that it has satisfied this burden in the instant case.

### A. The Initial Warrantless Search of the Subject Premises Was Justified by Probable Cause Coupled with Exigent Circumstances or, Alternatively, by the "Hot Pursuit" Exception to the Warrant Requirement[5]

In order to justify a warrantless entry into a home, the government must show probable cause as well as exigent circumstances.  See <u>United States v. Alaimalo</u>, 313 F.3d 1188, 1193 (9th Cir. 2002).  Probable cause justifying a warrantless entry requires the government to show a "fair probability that contraband or evidence of a crime" was in the residence.  <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983).

Meanwhile, exigent circumstances are defined as "those circumstances that would cause a reasonable person to believe that entry ... was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts."  <u>United States v. McConney</u>, 728 F.2d 1195, 1199 (9th Cir. 1984) (en banc).  "The exigencies must be viewed from the totality of circumstances known to the officers at

---

[5] As a threshold matter, the government does not concede that an illegal warrantless search which forms the basis for a subsequently court-authorized search warrant necessarily and automatically "taints" the subsequent search warrant.  Instead, once the affidavit in question is purged of any illegally-obtained information, a reviewing court must determine whether it afforded the magistrate "a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing."  <u>United States v. Grandstaff</u>, 813 F.2d 1353, 1355 (9th Cir. 1987).  However, since the initial search here was justifiable on at least two exceptions to the warrant requirement, the government submits that this Court need not engage in the analysis prescribed by the <u>Grandstaff</u> court.

6

the time of the warrantless intrusion." United States v. Licata, 761 F.2d 537, 543 (9th Cir. 1985). But because "[e]xigent circumstances necessarily imply that there is insufficient time to get a warrant," United States v. Echegoyen, 799 F.2d 1271, 1279 n. 5 (9th Cir. 1986), "the government must also show that a warrant could not have been obtained in time," United States v. Good, 780 F.2d 773, 775 (9th Cir. 1986). For the following reasons, the warrantless search was permissible under at least two of the delineated exigent circumstances exceptions.

### 1. The warrantless search was justified by officers' objectively reasonable concern for the immediate safety of others

In order to prevail on a claim that the exigent circumstances doctrine justified a warrantless search, the government must show that: (1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need. See United States v. Snipe, 515 F.3d 947, 952 (9th Cir. 2008); see also Brigham City, Utah v. Stuart, 547 U.S. 398, 404-06 (2006).

Both prongs of that test are met by the facts of the instant case. Here, officers had just begun investigating what appeared to be a beating followed by a brutal late-night murder that occurred only a few blocks away. Moreover, based on information provided by witnesses, officers had reason to believe that suspects running away from the scene - who could have themselves been injured - were within the Subject Premises. At that point, officers did not know if there were additional victims who might have been hurt; and, in fact, the

murder weapon had not yet been located, giving the officers reason to believe that the shooter still had it in his possession.

In addition, once defendant opened the front door, officers were able to see a male subject lying on the ground and another one on a bed, and when neither of them responded to the officers' verbal commands, it was objectively reasonable for officers to enter to check on the subjects' safety. This was especially true in light of the fact that previous announcements over the loudspeaker had not led to those occupants exiting the Subject Premises, unlike other residents who, as noted above, had complied and consented to searches of their respective apartments. Under the totality of the circumstances known to the officers at that time – and notably being less than two hours after they arrived on scene to investigate the murder of a young man shot in the head in an alley less than 500 feet away – the warrantless entry of the Subject Premises was objectively reasonable.

Likewise, the scope and manner of the search was reasonable. Before entering, the officers knocked and announced their presence via loudspeaker multiple times. They did not enter with guns drawn, and immediately began securing the individuals who began leaving the apartment. They used force (in the form of a taser) only after one suspect repeatedly refused to comply with their orders to show officers his hands. The initial search of the apartment was also restricted to the one bedroom where that suspect was laying on the floor.

The Ninth Circuit has affirmed such entries with even less persuasive fact patterns. In United States v. Black, 482 F.3d 1035 (9th Cir. 2006), the court considered whether officers properly

8

conducted a welfare search occasioned by a 911 call. In that call, the victim told police that Black had beat her up earlier that morning in the apartment and that he had a gun. Id. at 1039. The victim told the dispatcher that she would wait with her mother outside the apartment in a white truck for police to arrive; but when officers arrived on scene a few minutes later, there were no signs of the victim, her mother, or the truck. Id. Instead, one of the officers circled the building and found Black, who denied living in the apartment or knowing the victim. The officer conducted a pat-down of Black, who was behaving in an agitated fashion, and used the key in Black's pocket to enter the apartment and conduct a protective sweep. Id. During the sweep, the officer noticed a gun on the bed, for which he later obtained a warrant. Id. The court found that the warrantless search was justified under the circumstances, since the victim could have been in the apartment, badly injured or worse, shot by the gun she had reported seeing. Id. at 1040.

Similarly, in United States v. Reyes-Bosque, 596 F.3d 1017, 1030 (9th Cir. 2010), the court held that agents' warrantless search of an apartment believed to hold 20 illegal aliens was proper in both manner and scope where agents knocked and announced their presence before entering, even though they had their guns drawn and waited for at least twenty minutes for backup.

The facts presented to this Court militate in favor of the same result. In fact, as the panel in Black commented, "this is a case where the police would be harshly criticized had they not investigated." Black, 482 F.3d at 1040. The officers were objectively reasonable in their belief that additional victims, the suspects, or both were inside the Subject Premises, and that belief

9

was strengthened when officers saw non-responsive subjects lying on the floor and the ground, respectively, in the bedroom after defendant opened the door. The scope and manner of the search was appropriately limited to the bedroom of the apartment. Moreover, the late hour of night and the distance to a magistrate and police station also made it much more difficult to obtain a warrant; this is borne out by the fact that HPHD Det. Alpizar drafted a search warrant and affidavit to the magistrate at the earliest possible opportunity, later that morning. See also United States v. McCabe, 582 Fed. Appx. 680, 682 (9th Cir. July 2, 2014) (affirming warrantless entry of defendant's home where bleeding victim led officers to the remotely located home during the middle of the night).

Finally, and importantly, courts have observed that a significant factor in any exigency analysis necessarily turns on "the *gravity* of the underlying offense," which here is arguably the most grave crime of all – murder, in violation of California Penal Code § 187. Welsh v. Wisconsin, 466 U.S. 740, 752 (1984) (emphasis in original). In other words, a warrantless home entry is less justified when the underlying criminal offense is something minor, e.g., a misdemeanor, whereas in cases with more serious offenses, such as homicide, the exigency carries more weight.

Thus, the initial warrantless entry was justified under the threat to safety theory of exigent circumstances. Defendant's Motion therefore should be rejected.

### 2. Alternatively, the initial warrantless entry was justified by "hot pursuit" exigent circumstances

The hot pursuit exception to the warrant exigent circumstance provides that the "act of retreating into [a] house [cannot] thwart

10

an otherwise proper arrest." United States v. Santana, 427 U.S. 38, 42 (1976).  This exception "only applies when officers are in 'immediate' and 'continuous' pursuit of a suspect from the scene of the crime." United States v. Johnson, 256 F.3d 895, 907 (9th Cir. 2001) (en banc) (quoting Welsh v. Wisconsin, 466 U.S. 740, 753 (1984)).  As the name implies, there also must actually be a chase. Santana, 427 U.S. at 42–43 ("The District Court was correct in concluding that 'hot pursuit' means some sort of a chase, but it need not be an extended hue and cry 'in and about [the] public streets.'") (brackets in original).

Here, the facts also support application of the hot pursuit exception.  HPPD officers' arrival at the scene of the murder in the west alley of Templeton Street, north of Randolph Street in Huntington Park, began at approximately 1:00 a.m., when Officer Mares responded to 911 calls and observed a male subject with what appeared to be a gunshot wound to the back of his head, encircled in a pool of blood.  (Exhibit D, Crime Report, at 26.)  Emergency medical personnel arrived shortly afterward, and the victim was pronounced dead at approximately 1:16 a.m.  (Id.)  After speaking with witnesses in the immediate vicinity, officers began knocking on doors at locations where the suspects were last seen running toward, and the officers announced their presence through the loudspeaker.  The search was continuous and ongoing prior to their encounter with defendant, at approximately 3:30 a.m., when senior detectives arrived on scene to take over the investigation.  (Id. at 30.)

At approximately 1:22 a.m., additional HPPD officers arrived and began their investigation in earnest, setting up crime scene tape, creating a crime scene log of personnel at the location, and taking

11

digital photographs of the immediate area.  (Exhibit D at 27.)  After obtaining additional details from witnesses nearby as to the nature of the victim's beating and eventual murder, at least two witnesses confirmed that their last glimpses of the suspects was as the suspects were running toward or into the parking area containing the Subject Premises.  (Id. at 29; see also Exhibit E, Witness Statements Report, at 32-33.)  The officers then set up a perimeter around the two-block area, spanning less than 456 feet (see Exhibits F (Google aerial map) and G (street view map) of area surrounding the Subject Premises at 36, 38), and began entering the housing units to confirm that the suspects were not inside and that no one else was injured.

While there may have been no actual "chase" in terms of the most literal meaning of the word, there is no dispute that initial warrantless entry was closely temporally linked to the murder itself - a matter of hours, at most.  Officers did not at any time prior to the entry at the Subject Premises cease their investigation; to the contrary, they were busy interviewing witnesses in an effort to determine the precise location of the men observed running away from the murder scene.  And, in any event, as the Supreme Court noted in Santana, the pursuit need not be of the "extended hue and cry" variety in order to qualify as an exigent circumstance.

Accordingly, a second independent justification for the initial warrantless entry exists based on probable cause for the officers to believe that those responsible for the shooting death were inside the apartment, coupled with their concurrent pursuit of the suspects.

**IV.  CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court deny defendant's Motion in its entirety.